UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:19-cv-299-MOC-WCM

| | | |
|---|---|---|
| DAVID M. THURSTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| AVERY COUNTY SHERIFF'S | ) | |
| OFFICE et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————— | ) | |

**THIS MATTER** comes before the Court on a Motion for Summary Judgment by

Defendants Avery County Sheriff's Office, Avery County Sheriff Kevin Frye, and Avery County

Sheriff's Lieutenant Lee Buchanan. (Doc. No. 13).

I.    **BACKGROUND**

A.  **PROCEDURAL BACKGROUND**

Plaintiff David M. Thurston filed this action on October 21, 2019, asserting claims

against Defendants in connection with his arrest and prosecution for allegedly violating North

Carolina sex offender laws. (Doc. No. 5). The charges were later dismissed in favor of Mr.

Thurston. (Doc. No. 5 at ¶ 94). Plaintiff has named the following persons and entities as

Defendants in this action: (1) Avery County Sheriff's Office ("ACSO"); (2) Avery County

Sheriff Kevin Frye; and (3) Avery County Sheriff's Lieutenant Lee Buchanan ("Lt. Buchanan").

Sheriff Frye and Lt. Buchanan are sued in their official and individual capacities.

Mr. Thurston asserts a claim under 42 U.S.C. § 1983, alleging that Defendants violated

his federal constitutional rights by way of his arrest and prosecution. (Doc. No. 5 at ¶¶ 81-92).

1

Specifically, Mr. Thurston alleges that Defendants violated his Fourth Amendment right to be free from unreasonable seizure and false arrest.[1] Mr. Thurston asserts the following claims: First Claim, 42 U.S.C. § 1983 claim alleging procedural and substantive due process violations (Doc. No 5 at ¶¶ 81-92); Second Claim, Malicious Prosecution (Doc. No. 5 at ¶¶ 93-100); Third Claim, False Imprisonment and Actual Imprisonment (Doc. No. 5 at ¶¶ 101-107); Fourth Claim, Intentional Infliction of Emotional Distress (Doc. No. 5 at ¶¶ 108-113); Fifth Claim, Negligent Infliction of Emotional Distress (Doc. No. 5 at ¶¶ 114-120); and Sixth Claim, Assault and Battery (Doc. No. 5 at ¶¶ 121-168). Plaintiff seeks compensatory and punitive damages, as well as attorney's fees. (Doc. No. 5).

Defendants timely filed their Answer, (Doc. No. 7), denying Mr. Thurston's material allegations and asserting numerous affirmative defenses, including qualified immunity and governmental immunity. On November 25, 2020, Defendants filed their Motion for Summary Judgment. (Doc. No. 13). On December 23, 2020, Plaintiffs filed a Response in opposition (Doc. No. 19). Defendants filed a Reply on December 29, 2020. (Doc. No. 24). The Court held a hearing on the motion on February 9, 2021.

### B. FACTS

#### i. Mr. Thurston's Sex Offender History and Move to Avery County

In 1992, Mr. Thurston pled guilty to two counts of sexual assault involving underage

---

[1] Mr. Thurston alleges that his Fifth, Sixth, and Fourteenth Amendment rights were violated by being "falsely arrested without probable cause, humiliated, endangered, assaulted, battered, injured, falsely imprisoned, and maliciously prosecuted." (Doc. No. 5 at ¶¶ 84-85). But he has not attempted to argue or prosecute his Fifth, Sixth, and Fourteenth Amendment claims in opposing summary judgment. These claims are nonetheless in essence a Fourth Amendment false arrest claim.

children in Montana. (DT 11:17-21; 12: 1-9).[2] He moved to Avery County, North Carolina in March 2015. (DT 17:15-18). Frye was the Avery County Sheriff, and Lt. Buchanan was employed as a Captain by the Sheriff's Office. (KF 6:11-15);[3] (LB 6:22-25; 7:1-5).[4] In 2016, Lt. Buchanan handled the Sheriff's Office sexual offender registrations. (LB 8:25; 9:1-2; 40:12-24).

Under North Carolina law, individuals with "reportable convictions" are subject to sex offender registration and verification requirements. <u>See</u> N.C.G.S. Ch. 14, Art. 27A. Mr. Thurston acknowledged that he was required to register as a sex offender in North Carolina based on his Montana conviction. (DT 34: 9- 13); N.C.G.S. § 14-208.6 (4)(b) (final conviction in another state "substantially similar to an offense against a minor" in North Carolina is a "reportable conviction").

When he arrived in Avery County, Mr. Thurston came to the Sheriff's Office on March 12, 2015, and was informed about the requirements for individuals on the North Carolina sex offender registry. (DT 20: 12-25; 22: 5-16; 23: 16-23). Mr. Thurston was informed that he had a duty to register with the Sheriff's Office every year and then every six months after the first year. (DT 21: 22-25; 22: 1-3; DT Exhibit 1); N.C.G.S. § 14-208.9A(a)(1) (noting that registration shall be verified on the "anniversary of a person's initial registration date, and again six months after that date."). He was also informed that the North Carolina Department of Public Safety ("NCDPS") would send him a verification letter that he was required to return to the Sheriff's Office within three days after receipt. (DT 22: 2-4; DT Exhibit 1); N.C.G.S. §§ 14-208.9A(a)(1)-(2) (person shall return verification form within three days of receipt). He was further notified

---

[2] "DT" refers to the deposition of David Thurston, followed by reference page and line numbers or exhibit number. The deposition can be found at Doc. No. 14-3.
[3] "KF" refers to the deposition of Kevin Frye. The deposition can be found at Doc. No. 14-4.
[4] "LB" refers to the deposition of Lee Buchanan. The deposition can be found at Doc. No. 14-5.

that he needed to inform the Sheriff's Office if he changed his address. (DT Exhibit 1).

### ii. David Thurston seeks Sheriff Frye's permission to travel out-of-state for several weeks and receives permission to take the trip.

On August 9, 2016, Mr. Thurston contacted Sheriff Frye and informed him that he wanted to leave the state on August 11 to attend his nephew's wedding in Washington State and asked whether he would be able to go. (DT 107: 10-24; 108: 19-22); (KF 13: 17-24; 16: 23-25). Mr. Thurston sought permission to attend the wedding because traveling out west for a wedding scheduled for September 17, 2016, would prevent him from being able to submit his bi-annual verification form in person on September 12, 2016. (TA at ¶ 22).[5] He also sought permission because he feared the ACSO, after experiencing threats and intimidation from several officers the prior year. (TA at ¶¶ 6-20).[6] Mr. Thurston not only sought permission from Sheriff Frye before traveling, he also sought legal advice about the trip at the Appalachian Law Center and went in person to the Avery County District Attorney's Office. (TA at ¶ 22).

Following these inquiries, Sheriff Frye informed Mr. Thurston that he was looking into the request. (TA at ¶ 23). After several text messages were exchanged between Mr. Thurston and Sheriff Frye, the Sheriff responded to Mr. Thurston on August 11 granting him permission to take the trip. In response to a text from Mr. Thurston asking for an update on whether he could travel to the wedding, Sheriff Frye responded, "Go on, we are working on it." (KF 16: 3-6; 17: 1-8; KF Exhibit 3). Sheriff Frye also told Mr. Thurston to fill out a visitor registration form and

---

[5] TA refers to David Thurston's Affidavit, which can be found at Doc. No. 20-2.

[6] In his affidavit, Mr. Thurston recounts an officer telling him he could enter his house whenever he wanted to make sure his toothbrush was wet. He also recounts an event in 2015 where several officers in four police vehicles showed up at his house, asked to come in, poked around the house, and made thinly veiled threats about the danger of making the ACSO his enemy. If true, these events are disturbing and portray an office that seems to have malice toward Mr. Thurston.

email a copy of that registration to him within 10 days of arriving in Spokane. (DT 111: 14-22). This was all Sheriff Frye told Mr. Thurston he needed to do to take the trip. The precise length of the trip was not discussed, but the context of the conversations indicates that it was clear that this trip would last several weeks. These conversations make clear that "Sheriff Frye gave express permission to Thurston to travel to Washington State, prior to his departure date." (See SC at ¶ 10).[7]

On August 15, while Mr. Thurston was on his way to Spokane, Sheriff Frye texted Mr. Thurston and asked him for the address where he would be staying. (TA at ¶ 25). Sheriff Frye told Mr. Thurston that he needed the address to put Mr. Thurston on "pending status" so that "it will not flag at SBI." (TA at ¶ 25). Mr. Thurston texted Frye the requested information. (TA at ¶ 25; KF, Exhibit 3). When Mr. Thurston arrived in Spokane, Mr. Thurston registered as a visitor as instructed and texted and emailed Sheriff Frye photographs of the paperwork. (Doc. No. 21, Exhibit 8). Sheriff Frye acknowledged receipt of these documents. (Id.).

Mr. Thurston left Avery County on August 11, 2016, and returned on October 19, 2016, with stops in Denver, Spokane, and Seattle. (DT 50: 25; 51: 1-2; 53: 7-17; 59: 2-24; 60: 1-10; 61: 13-16).

### iii. David Thurston is mailed a verification form, requests further guidance, and is urged to return to Avery County by October 19.

Pursuant to N.C.G.S. § 14-208.9A(a)(1), Mr. Thurston's six-month registration date was September 12, 2016. (DT 22: 11-16). On September 9, Mr. Thurston's sister informed him that the NCDPS mailed a verification letter to him. (DT 29: 16-25). Mr. Thurston contacted Sheriff

---

[7] SC refers to the Affidavit of Scott C. Casey, which is located at Doc. No. 20-3.

Frye on September 9 about how to return the verification form, but he never responded. (DT 29: 24-25; 30: 1-10); (KF, Exhibit 3). Since Mr. Thurston received no response, he "let it lie" and candidly admitted that he failed to return the verification form by his six-month registration date. (DT 44: 12-21). However, it is important to note that one of the main reasons Mr. Thurston sought Sheriff Frye's permission to travel out west in the first place was he knew that taking the trip would mean that he would not be able to return the verification form in person as required.

On October 6, Mr. Thurston received a phone call from Detective Simmons with the Spokane County Sheriff's Office and was informed that Lt. Buchanan from Avery County was looking for him. (TA at ¶ 29). Detective Simmons relayed to Mr. Thurston that Lt. Buchanan was considering having the U.S. Marshal Service arrest him. (TA at ¶ 30). However, Detective Simmons advised that as long as Mr. Thurston was gone by October 10, there would be no problem. (TA at ¶ 30). Furthermore, Detective Simmons contacted the U.S. Marshal's Office and was informed that they considered Mr. Thurston in compliance with federal law. (TA at ¶ 31).

Confused by his conversation with Detective Simmons, Mr. Thurston reached out to Lt. Buchanan to seek clarification and guidance on how to proceed. (TA at ¶ 32). On that phone call, Lt. Buchanan told Mr. Thurston, without any legal support, that Mr. Thurston could not be out of state for more than 30 days. (TA at ¶ 32). He also told Mr. Thurston that Mr. Thurston's absence was causing trouble for Sheriff Frye. (TA at ¶ 32). On this call, Mr. Thurston informed Lt. Buchanan that he had received permission for the trip from Sheriff Frye. (TA at ¶ 34). Mr. Thurston then asked if would be able to drive back to Avery County or if he would be arrested on the way. (TA at ¶ 37). Lt. Buchanan noted that he had spoken to Sheriff Frye, and if Mr. Thurston was back in Avery County by October 19, then "there would be no problem" and he would not put out a national warrant for Mr. Thurston's arrest. (TA at ¶ 37).

6

Mr. Thurston began his journey back to Avery County on October 9, 2016, and he arrived at his home on October 19. (TA at ¶ 38). He had been gone for 69 days. (TA at ¶ 38).

### iv. Lt. Buchanan Obtains an Arrest Warrant to Charge Mr. Thurston, Mr. Thurston is arrested, and the charges against Mr. Thurston are dismissed.

After Mr. Thurston failed to return his verification form, or register by September 12, 2016, Lt. Buchanan and another deputy, Sergeant Turbyfill, went to Mr. Thurston's residence on September 29, 2016, at 9:33 p.m., September 30, 2016, at 13:20, and October 3, 2016, at 12:00 pm to see if he was present. (LB 46: 2-16). Mr. Thurston was not at his home during at any of those visits because he was in Washington State with Sheriff Frye's permission. (LB 22: 3-7; 45: 16-20; Exhibit 7).

Mr. Thurston did not have communication with anyone from the ACSO from September 9 until sometime after September 18 when he had the phone call with Lt. Buchanan in which Mr. Thurston was informed that he needed to be back in North Carolina by October 19. (DT 88: 16-25; 89: 1-5).

After going by Mr. Thurston's home three times, Lt. Buchanan consulted with the assistant district attorney, Penn Dameron, about bringing criminal charges against Mr. Thurston. (LB 44: 5-13). Dameron advised Lt. Buchanan to take charges out against Mr. Thurston. (LB 44: 17-19). Lt. Buchanan presented information to a state court magistrate, who then issued warrants for Mr. Thurston's arrest. (LB 20: 24-25; 21:1-2). The Magistrate issued warrants for Mr. Thurston's arrest on October 19, 2016, for three charges: 1) being "out of state for thirty (30) + days as required by state law," in violation of N.C.G.S. § 14-208.11; 2) failing to return his verification form in time, in violation of N.C.G.S. § 14-208.11(A)(2); and 3) failing to report in person to the Sheriff's Office, in violation of N.C.G.S. § 14-208.11. (KF, Exhibit 1). The dates of

7

offense were from September 19, 2016, until October 18, 2016. Id.

On October 21, 2016, Mr. Thurston went with his sister to the ACSO to submit his verification letter in person. (TA at ¶ 38). He was arrested on that date and placed in a booking/holding room until his sister could acquire $25,000.00 to pay his bail. She returned that same day, and he was released.

On October 24, 2016, Mr. Thurston and his sister went back to ACSO to again try and turn in his registration letter and prove that he had not changed his address in Avery County. (TA at ¶ 43). At the ACSO, Sheriff Frye called Mr. Thurston and Deborah back into his office where he explained why Mr. Thurston was in trouble. (TA at ¶ 45). Sheriff Frye informed Mr. Thurston that Lt. Buchanan had been in communication with him and shown him a statute that said Mr. Thurston could not be gone for 30 days. (TA at ¶ 45). Ultimately, it would become clear that no such statute or regulation exists. All charges were voluntarily dismissed by the government on April 21, 2017, because the "charges arose due to misunderstanding with regard to how to comply with technical requirements." (KF, Exhibit 2). As a result of being unconstitutionally seized and searched, Mr. Thurston claims that he has been emotionally and physically harmed by his arrest and malicious prosecution. (TA at ¶ 64).

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for

8

its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III.   DISCUSSION

### A.  CLAIMS AGAINST AVERY COUNTY SHERIFF'S OFFICE

The capacity of an entity to sue or be sued is "determined by the law of the state where the court is located." FED. R. CIV. P. 17(b). It is well established in North Carolina that "unless a statute provides to the contrary, only persons in being may be sued." Coleman v. Cooper, 89 N.C. App. 188, 192 (1988) (internal citations omitted). As there is no statute authorizing suit against the ACSO, the ACSO is entitled to summary judgment as a matter of law on all claims.

9

Parker v. Bladen Cty., 583 F. Supp. 2d 736, 740 (E.D.N.C. 2008) (Bladen County Sheriff's Office is a non-suable entity).

## B. SECTION 1983 INDIVIDUAL CAPACITY CLAIMS AGAINST SHERIFF FRYE AND LT. BUCHANAN

While the caption for the Plaintiff's first claim for relief is titled "[p]rocedural and [s]ubstantive [d]ue [p]rocess; [r]ight to [t]ravel," this claim is, in reality, a Fourth Amendment false arrest claim. Taylor v. Waters, 81 F.3d 429, 435 (4th Cir. 1996) (Fourth Amendment defines process due for seizures of persons). Although the Plaintiff alleges that his Fourth, Fifth, Sixth, and Fourteenth Amendments were violated by being "falsely arrested without probable cause, humiliated, endangered, assaulted, battered, injured, falsely imprisoned and maliciously prosecuted," (Document 5, ¶¶ 84-85), his reliance on the Fifth, Sixth, and Fourteenth Amendments is misplaced.

The Due Process Clause of the Fifth Amendment has no application to the states, but is instead a restraint on actions of the federal government. Winfield v. Bass, 106 F.3d 525, 530 n.2 (4th Cir. 1997). The Sixth Amendment guarantees the accused the right to "be informed of the nature and cause of the accusation," U.S. CONST. AMEND. VI, and is inapplicable in this case. Last, the due process provisions of the Fourteenth Amendment are inapplicable to claims of pretrial seizure, restraint, and confinement. Safar v. Tingle, 859 F.3d 241, 245 (4th Cir. 2017) (the Due Process Clause "is not the proper lens through which to evaluate law enforcement's pretrial missteps" when the Fourth Amendment provides a textual source of constitutional protection). The right to be free from arrest and the detention that comes with arrest arises exclusively from the Fourth Amendment. Brooks v. City of Winston-Salem, 85 F.3d 178, 184 (4th Cir. 1996). Therefore, the Court construes the first claim as raising only a Fourth

10

Amendment claim.

Mr. Thurston brings his Fourth Amendment claim against Defendants Frye and Buchanan in their individual capacities through Section 1983. This claim is based on Mr. Thurston's contention that his arrest was not based on probable cause. In response, Defendants argue that there was no Fourth Amendment violation because there was probable cause for the arrest and, if there is a Fourth Amendment violation, then the officers are protected by qualified immunity. With regards to Sheriff Frye, the defense also contends that he cannot be liable because he did not act personally in the deprivation of Mr. Thurston's rights. For the following reasons, the Court finds that Mr. Thurston has presented sufficient evidence of a Fourth Amendment violation for his claim to survive summary judgment. The Court also finds that Defendants Frye and Buchanan are not entitled to qualified immunity.

> **i.     Sheriff Frye's Involvement in Mr. Thurston's Arrest**

To establish liability under Section 1983, Mr. Thurston must affirmatively show that the Defendants "acted personally in the deprivation of the plaintiff's rights." Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985) (internal citations omitted); Garraghty v. Commonwealth of Virginia, Dep't of Corr., 52 F.3d 1274, 1280 (4th Cir. 1995). As a result, there must be some evidence of wrongdoing or involvement against Sheriff Frye to assert an individual capacity claim against him. Wilcox v. Brown, 877 F.3d 161, 170 (4th Cir. 2017).

In this case, Sheriff Frye did not arrest Mr. Thurston or provide any information to the magistrate like Lt. Buchanan. However, it is unclear what communications occurred between Lt. Buchanan and Sheriff Frye as Lt. Buchanan began to seek an arrest warrant for Mr. Thurston. Sheriff Frye is the leader of a small office. There is evidence that Sheriff Frye and Lt. Buchanan spoke about Mr. Thurston's trip to Washington State both while Mr. Thurston was on the trip

11

and after he returned. Moreover, Sheriff Frye, through text messages and in-person communications, expressly authorized Mr. Thurston to go on his trip and gave him instructions to follow. This is more than minimal involvement, especially because Mr. Thurston would not have gone on his trip without Sheriff Frye's express authorization. In short, there is enough evidence to survive summary judgment that Sheriff Frye may have participated in the arrest of Mr. Thurston without probable cause as a result of his advice and instructions to Mr. Thurston and his conversations with Lt. Buchanan.

### ii. Lt. Buchanan's Lack of Probable Cause to Arrest Mr. Thurston

Defendants next contend that there was no violation of Mr. Thurston's constitutional rights because probable cause existed to arrest Mr. Thurston. The Court disagrees. A case involving an arrest, such as this one, implicates the Fourth Amendment's prohibition against "unreasonable…seizures." U.S. CONST. AMEND. IV.[8] "The Fourth Amendment prohibits law enforcement officers from making unreasonable seizures, and a seizure of an individual effected without probable cause is unreasonable." Brooks, 85 F.3d at 183. Conversely, a seizure effected with probable cause is reasonable as a matter of law; thus, the existence of probable cause defeats a claim of "unreasonable seizure" under the Fourth Amendment. See Street v. Surdyka, 492 F.2d 368, 372-73 (4th Cir. 1974). "The Constitution does not guarantee that only the guilty will be arrested." Baker v. McCollan, 443 U.S. 137, 145 (1979).

If probable cause exists when an officer seeks issuance of a warrant, then the officer's action in seeking the warrant and the subsequent arrest do not violate the Fourth Amendment.

---

[8] A Section 1983 "malicious prosecution" claim "is properly understood as a Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort." Lambert v. Williams, 223 F.3d 257, 261-62 (4th Cir. 2000).

12

Thus, an officer who arrests a suspect pursuant to a warrant does not violate the Fourth Amendment unless that officer did not possess probable cause to seek the warrant. Porterfield v. Lott, 156 F.3d 563, 570 (4th Cir. 1998); Brooks, 85 F.3d at 184 n.7.

As the Supreme Court has recently reiterated, "probable cause is not a high bar." District of Columbia v. Wesby, 138 S. Ct. 577, 586 (2018). "While probable cause requires more than 'bare suspicion,' it requires less than that evidence necessary to convict." United States v. Gray, 137 F.3d 765, 769 (4th Cir. 1998); Wong Sun v. United States, 371 U.S. 471, 479 (1963). The arresting officer's belief need not be correct or even more likely true than false. Texas v. Brown, 460 U.S. 730, 742 (1983). Indeed, the Fourth Circuit has specifically rejected the argument that "probable cause means more likely than not, [more than] 50/50," and made it clear that "the probable-cause standard does not require that the officer's belief be more likely true than false." United States v. Humphries, 372 F.3d 653, 660 (4th Cir. 2004). Therefore, a reasonable officer may have probable cause to believe a suspect has committed a crime even if the officer's belief is not more likely true than false. "Probable cause determinations are … preliminary and tentative." Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 11 (1st Cir. 2004). Since probable cause does not even require a showing that guilt is more probable than not, the probable cause stage is not the stage where the ultimate question of guilt or innocence is determined. Instead, the determination of a suspect's guilt or innocence is reserved for trial, where it is placed in the hands of the judge and the jury. Baker, 443 U.S. at 146; United States v. Colkley, 899 F.2d 297, 302 (4th Cir. 1990). Thus, it is irrelevant to the probable cause analysis whether the suspect is later acquitted. Michigan v. DeFillippo, 443 U.S. 31, 36 (1979).

Moreover, whether probable cause exists "is a mixed question of law and fact, but where the facts are admitted or established, the existence of probable cause is a question of law for the

13

court." Best v. Duke Univ., 337 N.C. 742, 750 (1994); see also Ornelas v. United States, 517 U.S. 690, 696 (1996) ("The principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause. The first part of the analysis involves only a determination of historical facts, but the second is a mixed question of law and fact . . .").

In determining whether probable cause exists, courts are to limit their consideration to the facts and circumstances "known to the officer at the time of the arrest." Taylor, 81 F.3d at 434; Gomez v. Atkins, 296 F.3d 253, 262 (4th Cir. 2002); United States v. Al-Talib, 55 F.3d 923, 931 (4th Cir. 1995). Thus, evidence that was unknown to the officer at the time of the arrest is irrelevant to the determination of whether probable cause existed to arrest the suspect. See e.g., Reynolds v. Jamison, 488 F.3d 756, 765 (7th Cir. 2007); Xing Qian v. Kautz, 168 F.3d 949, 953-54 (7th Cir. 1999). In order "[t]o determine whether an officer had probable cause to arrest an individual, [courts] examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable officer, amount to probable cause." Maryland v. Pringle, 540 U.S. 366, 371 (2003).

Finally, when an element of the crime includes a *mens rea*, there also needs to be probable cause to warrant a belief that the suspect had the requisite *mens rea* to commit a violation of the law or statute at issue. See Stubbs v. Las Vegas Metro. Police Dep't, 792 Fed. Appx. 441, 442 (9th Cir. 2019); Kleinschnitz v. Phares, No. 1:13-cv-0209-MEF, 2013 WL 5797621 (M.D. Ala. 2013); see e.g. Glenn-Robinson v. Acker, 140 N.C. App. 606, 619-20 (2000) (reasoning that there was no probable cause to arrest the plaintiff for "willfully"

14

disobeying a police officer when there was a question of fact as to whether the plaintiff knew the person giving him orders was a police officer).

Because there is a genuine dispute of material fact as to whether the authorities lacked probable cause to arrest and charge Mr. Thurston, the Court holds that Mr. Thurston's Section 1983 Fourth Amendment claim survives summary judgment. Here, Mr. Thurston was arrested and charged with violating three laws:

a. G.S. 14-208.11, alleged violation of Article 27, Chapter 14, that Thurston failed to register "that he would be out of state for (30) + days as required by state law."

b. G.S. 14-208.11(a)(2), alleged violation of Article 27, that Mr. Thurston **<u>willfully</u>** and feloniously failed to return verification notice to the Avery County Sheriff's Office in the time allotted by North Carolina state statute.

c. G.S. 14-208.11, alleged violation of Article 27, Chapter 14, that Mr. Thurston **<u>willfully</u>** and feloniously failed to report in person to the Avery County Sheriff's Office as required by law.

(emphasis added). Of the above three laws, the first does not exist. Therefore, Lt. Buchanan must have had probable cause that Mr. Thurston violated one of the latter two laws. Both of those laws have a willful *mens rea*. This means that he would need to have probable cause that Mr. Thurston <u>willfully</u> violated those provisions. As a general matter, when used in the criminal context, a "willful" act is one undertaken with a "bad purpose." <u>Bryan v. United States</u>, 524 U.S. 184, 191–92 (1998). "The word 'willfully' means something more than an intention to commit the offense." <u>Glenn-Robinson</u>, 140 N.C. App. at 619. Willfully "implies committing the offense purposely and designedly in violation of law." <u>State v. Stephenson</u>, 218 N.C. 258, 264 (1940).

The record fails to establish that probable cause existed to warrant a belief that Mr. Thurston had the requisite *mens rea* to willfully violate those statutory provisions. Lt. Buchanan had information that would establish to a reasonable officer that Mr. Thurston lacked the

15

necessary willful *mens rea*. Before leaving on his trip, Mr. Thurston communicated extensively with Sheriff Frye and the ACSO seeking permission to take the trip. While on the trip, Mr. Thurston complied with all requirements laid out by Sheriff Frye and communicated by text message with Sheriff Frye. Lt. Buchanan worked in the same small office with Sheriff Frye and was supervised by Sheriff Frye. Furthermore, it is clear that Sheriff Frye and Lt. Buchanan had some kind of conversation about Mr. Thurston's trip between the dates of September 9, 2016, and October 24, 2016, because Sheriff Frye told Mr. Thurston that Lt. Buchanan had met with him and showed him the statutes that Mr. Thurston was supposedly violating.

Even assuming that Sheriff Frye and Lt. Buchanan did not communicate about Mr. Thurston's trip before he left, Lt. Buchanan definitely knew that Mr. Thurston had obtained permission from Sheriff Frye to take the trip and that Mr. Thurston was eager to comply with the law. He knew these things because of his own individual conversation with Mr. Thurston that occurred sometime after September 18, 2016.

To be clear, requiring Lt. Buchanan to have probable cause of willfulness does not conflate the probable cause standard and the standard needed to convict a criminal defendant. Lt. Buchanan did not need to know beyond a reasonable doubt that Mr. Thurston willfully violated the above statutes; he simply needed to have something "more than bare suspicion" and "less than the evidence necessary to convict" that Mr. Thurston willfully violated those provisions. See Gray, 137 F.3d at 769 (internal quotation marks omitted). Here, Mr. Thurston sought pre-travel authorization for his trip, communicated with the sheriff on the trip, fulfilled all instructions outlined by the Sheriff, notified Lt. Buchanan that he had permission to take the trip from Lt. Buchanan's boss, requested Lt. Buchanan's guidance on how to comply when they spoke on the phone, and willingly complied with Lt. Buchanan's instruction that he be back in

16

Avery County by October 19, 2016. In addition, within three days of returning to Avery County, Mr. Thurston, in order to be sure that he was now in compliance with North Carolina statutes, drove to the ACSO to submit his registration form and check-in about further steps he needed to take. Mr. Thurston was, quite literally, arrested while standing in the ACSO willfully attempting to ensure that he was not violating the law.

Finally, the facts that Lt. Buchanan went to Mr. Thurston's home three times, consulted with the district attorney about bringing criminal charges against Mr. Thurston, and received an arrest warrant from a magistrate are not sufficient to defeat Mr. Thurston's claim at the summary judgment phase. All these facts weigh in favor of the existence of probable cause, but there remains a genuine dispute of material fact about what Lt. Buchanan knew and what he communicated to the district attorney and magistrate judge when he sought the warrant.

In sum, based on the evidence before the court at the summary judgment stage, the court cannot conclude that a reasonable officer in Lt. Buchanan's situation would have believed he had probable cause to arrest Mr. Thurston. As such, Mr. Thurston's Section 1983 claim against Sheriff Frye and Lt. Buchanan for a violation of his Fourth Amendment rights survives this motion for summary judgment.

### C. QUALIFIED IMMUNITY

The Court next finds that Defendants are not entitled to qualified immunity. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Officials who are sued for civil damages are entitled to qualified immunity unless (1) the complaint sufficiently alleges a violation of a constitutional

right, and (2) the right at issue, defined at the appropriate level of generality, was "clearly established" at the time of the alleged misconduct. Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs., 597 F.3d 163, 169 (4th Cir. 2010). It is within the court's discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Id. (quoting Pearson, 555 U.S. at 236).

A constitutional right is clearly established where "its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (internal quotation marks omitted). "[I]f there is a legitimate question as to whether an official's conduct constitutes a constitutional violation, the official is entitled to qualified immunity." Martin v. Saint Mary's Dep't of Soc. Servs., 346 F.3d 502, 505 (4th Cir. 2003) (internal quotation marks omitted).

In analyzing qualified immunity, the relevant inquiry is whether a reasonable officer possessing the same information could have believed that probable cause existed.[9] In making this inquiry, the issue is not whether probable cause existed; rather, the issue is whether arguable probable cause existed. Kleinschnitz, 2013 WL 5797621. As the Supreme Court has instructed in Malley v. Briggs, 475 U.S. 335, 341, 346 n.9 (1988), an officer is entitled to qualified immunity if "officers of reasonable competence could disagree" on the issue of probable cause. See also Porterfield, 156 F.3d at 568. If arguable probable cause exists—even if actual probable cause is not present—the officer is entitled to qualified immunity. See e.g., Keil v. Triveline, 661 F.3d

---

[9] In determining qualified immunity, the Court must consider the particular facts of the case and the totality of the circumstances in determining whether the law was so clearly established that a reasonable officer or defendant would not have found probable cause. Here, the issue is whether, under the particularized facts of this case, Sheriff Frye and Lt. Buchanan violated Mr. Thurston's federal constitutional rights by arresting Mr. Thurston based on a warrant lacking probable cause.

981, 986-87 (8th Cir. 2011). Furthermore, whether arguable probable cause exists depends on the elements of the crime and the particular facts. Crosby v. Monroe Cnty., 394 F. 3d 1328, 1333 (11th Cir. 2004).

Here, the Court further finds on the facts before it at this time that Defendants lacked arguable probable cause for many of the reasons that probable cause does not exist. The ACSO, Sheriff Frye, and Lt. Buchanan all had ample information that Mr. Thurston was trying to comply with the law and actively working to satisfy any conditions and instructions provided by either Sheriff Frye or Lt. Buchanan. In other words, this is a case in which "no officer of reasonable competence would have requested the warrant." Malley v. Briggs, 475 U.S. at 346 n.9. Rather, a reasonable officer would have known that Mr. Thurston was attempting to comply with Sheriff Frye and Lt. Buchanan's requests, as well as North Carolina law. This is likely why the government quickly and voluntarily dismissed the charges against Mr. Thurston due to a "misunderstanding with regard to how to comply with technical requirements." (KF, Exhibit 2).

Since Lt. Buchanan lacked arguable probable cause to arrest Mr. Thurston for any of the charged statutory violations, the Court must determine whether the constitutional rights Lt. Buchanan violated were clearly established at the time. Binding precedent in the Fourth Circuit at the time of Mr. Thurston's arrest clearly established that an arrest made without probable cause violates the Fourth Amendment's prohibition on unreasonable searches and seizures. See Brown v. Gilmore, 278 F.3d 362, 367 (4th Cir. 2002); Taylor v. Waters, 81 F.3d 429, 436 (4th Cir. 1996). Because the factual allegations of Mr. Thurston's Complaint and the evidence presented by both sides demonstrates that Mr. Thurston was arrested without arguable probable cause, Defendants Frye and Buchanan are not entitled to qualified immunity.

In sum, Mr. Thurston has raised a genuine issue of material fact on summary judgment as

19

to whether Defendants violated Mr. Thurston's Fourth Amendment rights, and Defendants are not entitled to qualified immunity as to Plaintiffs' Section 1983 Fourth Amendment claim. Thus, Defendants' Motion for Summary Judgment regarding the individual capacity claims against Sheriff Frye and Lt. Buchanan is denied.

### D.  MUNICIPALITY LIABILITY

Even if Mr. Thurston's rights were violated, he still cannot demonstrate that any policies or customs of the Sheriff's Office inflicted any injuries to him. Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690-91(1978). In this case, Mr. Thurston contends that there is a "policy or custom…of allowing agents, servants, and employees, to over-reach, use their police power, unequal standing, excessive force, aggression, and intimidation, to seize, question, detain, arrest, and invade one's privacy." (Doc No. 5 at ¶ 84).

The Fourth Circuit has held that "[t]he substantive requirements for proof of municipal liability are stringent." Jordan by Jordan v. Jackson, 15 F.3d 333, 338 (4th Cir. 1994). A municipal policy or custom may arise through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law." Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003). There is no evidence in the record to support a known history of "persistent and widespread" constitutional deprivations on the part of Sheriff's employees from which to infer a policy or custom of the Sheriff's Office. Milligan v. City of Newport News, 743 F.2d 227, 229-30 (4th Cir. 1984); see Lanford v. Prince George's Cty., 199 F. Supp. 2d 297, 305 (D. Md. 2002) (finding that the plaintiff failed to provide support for his *Monell* claim when he pleaded "conclusory factual allegations devoid of any reference to actual events").

As Mr. Thurston has failed to identify any municipal policy or custom that caused his injuries, his official capacity claim against Sheriff Frye is barred. Board of Comm'rs of Bryan

Cty. v. Brown, 520 U.S. 397, 403 (1997); Pembaur v. City of Cincinnati, 475 U.S. 469, 479-81 (1986). In addition, any official capacity Section 1983 claim against Lt. Buchanan is barred because it is duplicative to the official capacity claim against Sheriff Frye. See Love-Lane v. Martin, 355 F.3d 766, 783 (4th Cir. 2004).

## IV.    PLAINTIFFS' STATE LAW TORT CLAIMS

### A.    Official Capacity Claims

As to Mr. Thurston's state tort claims, Defendants contend that official capacity claims against Sheriff Frye and Lt. Buchanan are precluded by sovereign immunity. For the following reasons, the Court agrees that sovereign immunity applies to shield Defendants from liability in their official capacities as to Plaintiff's state law tort claims.

"Official capacity" suits are merely another way of pleading an action against the governmental entity of which the individual is an agent. Moore v. City of Creedmoor, 345 N.C. 356, 367 (1997). Plaintiff's official capacity state law tort claims fail because there has been no waiver of governmental immunity. "The doctrine of sovereign immunity bars actions against public officials sued in their official capacities. Sheriffs and deputy sheriffs are considered public officials for purposes of sovereign immunity." Phillips v. Gray, 163 N.C. App. 52, 56-57 (2004). Governmental officials are entitled to governmental immunity unless they waive it through the purchase of insurance; however, any waiver is limited solely to the extent of insurance coverage. Satorre v. New Hanover Cty. Bd. of Comm'rs, 165 N.C. App. 173, 176 (2004) (citing N.C. GEN. STAT. § 153A-435(a)). "If the insurance policy does not indemnify the defendant against the [] acts alleged in plaintiff's complaint, defendant has not waived its sovereign immunity." Doe v. Jenkins, 144 N.C. App. 131, 135 (2001).

21

As demonstrated by the declaration of Virgil Hollingsworth,[10] Sheriff Frye and Lt. Buchanan in their official capacities are entitled to sovereign immunity. The county's general liability insurance coverage specifically excludes coverage of claims where the Defendants are entitled to sovereign immunity. (VH Dec. at ¶ 6; Section II H to VH Dec.) The public official liability and law enforcement liability coverages for fiscal year 2016-2017 specifically exclude coverage of "any claim for which the Covered Person is protected by sovereign immunity or governmental immunity under North Carolina law." (VH Dec. at ¶ 6; Sections VD, VID to VH Dec.).

Numerous courts have held that virtually identical coverage exclusions do not waive entitlement to sovereign immunity. See Patrick v. Wake Cnty. Dep't of Human Servs., 188 N.C.App. 592, 596 (2008) (no waiver of immunity where liability insurance policy issued to DSS stated: "[t]his policy is not intended by the insured to waive its governmental immunity as allowed by North Carolina General Statutes Sec. 153A-435."); Estate of Earley v. Haywood Cnty. Dep't of Soc. Servs., 204 N.C. App. 338, 341-43 (2010) (no waiver of immunity where coverage is not provided for "[a]ny claim, demand, or cause of action against any Covered Person as to which the Covered Person is entitled to sovereign immunity or governmental immunity under North Carolina Law."); accord Owen v. Haywood Cnty., 205 N.C. App. 456, 460 (2010); Cooper v. Brunswick Cnty. Sheriff's Dep't, 896 F. Supp. 2d 432, 453 (E.D.N.C. 2012); Russ v. Causey, 732 F. Supp. 2d 589, 609-11 (E.D.N.C. 2010).

Therefore, Mr. Thurston's state law claims against Sheriff Frye and Lt. Buchanan in their official capacities are barred by sovereign immunity.

---

[10] Virgil Hollingsworth Declaration can be found at Doc. No. 14-6.

### B. Individual Capacity Claims

Eleventh Amendment sovereign immunity does not bar individual capacity suits, nor are state officers absolutely immune from personal liability under Section 1983 solely by virtue of the "official" nature of their acts. Hafer v. Melo, 502 U.S. 21, 31 (1991). To sustain the personal or individual capacity suit, the plaintiff must initially make a prima facie showing that the defendant-official's tortious conduct falls within one of the immunity exceptions, i.e., that the official's conduct is malicious, corrupt, or outside the scope of official authority. Epps v. Duke Univ., 122 N.C. App. 198, 205 (1996); Locus v. Fayetteville State Univ., 102 N.C. App. 522, 526 (1991). Put another way, "as long as a public officer lawfully exercises the judgment and discretion with which he is invested by virtue of his office, keeps within the scope of his official authority, and acts without malice or corruption, he is protected from liability." Grad v. Kaasa, 312 N.C. 310, 313 (1984) (citing Smith v. State, 289 N.C. 303, 331 (1976)). A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another. Grad, 312 N.C. at 313 (citing Givens v. Sellars, 273 N.C. 44 (1968)). "An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." Grad, 312 N.C. at 313 (citing Givens, 273 N.C. at 50 (quoting Everett v. Receivers, 121 N.C. 519 (1897))).

Furthermore, courts must presume "that a public official in the performance of his official duties 'acts fairly, impartially, and in good faith and in the exercise of sound judgment or discretion, for the purpose of promoting the public good and protecting the public interest.'" Lunsford v. Renn, 207 N.C. App. 298, 310 (2010). The presumption can only be rebutted by affirmative evidence and "[e]very reasonable intendment will be made in support of the

23

presumption." Huntley v. Potter, 255 N.C. 619, 628 (1961). "[T]he burden is on [plaintiff] to overcome the presumption by competent and substantial evidence." In re Annexation Ordinance No. 300-X, 304 N.C. 549, 551 (1981).

Here, the forecast of evidence tends to show that Sheriff Frye and Lt. Buchanan acted outside the scope of their official authority by seeking a warrant and arresting Mr. Thurston without probable cause. Based on the knowledge that the officers knew or should have known, there is a genuine issue of fact as to whether Sheriff Frye and Lt. Buchanan acted maliciously or corruptly in charging and arresting Mr. Thurston. When all the communications between Sheriff Frye, Lt. Buchanan, and Mr. Thurston are seen alongside Mr. Thurston's compliance with every request made of him, it can reasonably be argued that Defendants' acts were the kind "which a man of reasonable intelligence would know to be contrary to his duty." Grad 312 N.C. at 313.

Thus, to the extend that Sheriff Frye and Lt. Buchanan have been sued in their individual capacities, they do not enjoy public officer immunity. Therefore, the Court proceeds to determine what state tort claims against Defendants in their individual capacities survive summary judgment.

## 1. Plaintiff's Claim for Malicious Prosecution

A claim for malicious prosecution under North Carolina law requires a plaintiff to establish four elements: "(1) the defendant initiated the earlier proceeding; (2) malice on the part of the defendant in doing so; (3) lack of probable cause for the initiation of the earlier proceeding; and (4) termination of the earlier proceeding in favor of the plaintiff." Beroth Oil Co. v. Whiteheart, 173 N.C. App. 89, 99 (2005). Here, (1) Defendants initiated the earlier proceeding against Mr. Thurston, (2) it is unclear whether the proceeding was initiated with malice, (3) Mr. Thurston's arrest seems unsupported by probable cause, and (4) the proceeding

24

against Mr. Thurston was terminated in his favor. Therefore, there is sufficient evidence available for Mr. Thurston's malicious prosecution claim to survive summary judgment.

### 2. Plaintiff's False Arrest/False Imprisonment Claim

Next, to establish a claim for false arrest/imprisonment, a plaintiff must show: "(1) the illegal restraint of plaintiff by defendant, (2) by force or implied threat of force, and (3) against Plaintiffs' will." Rousselo, 128 N.C. at 449. It is well settled that probable cause is an absolute bar to a claim for false arrest or false imprisonment. Williams v. City of Jacksonville Police Dep't, 165 N.C. App. 587, 596 (2004). The Court has already determined that Defendants likely lacked probable cause or arguable probable cause to place Mr. Thurston under arrest. Placing someone under arrest without probable cause constitutes false imprisonment. Therefore, Defendants are not entitled to summary judgement on Mr. Thurston's false arrest/false imprisonment claims.

### 3. Plaintiff's Claim for Intentional Infliction of Emotional Distress

Next, as to Plaintiffs' claim for intentional infliction of emotional distress, the North Carolina Supreme Court has established a three-prong test for determining whether conduct arises to the level of intentional infliction of emotional distress ("IIED"): (1) extreme and outrageous conduct, (2) which is intended to cause, and (3) does cause severe emotional distress to another. Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A., 327 N.C. 283, 304 (1990)). Whether the conduct alleged is sufficiently extreme and outrageous to support an IIED claim is initially a question of law for the court. Lenins v. K-Mart Corp., 98 N.C. App. 590, 599 (1990).

Defendants are entitled to summary judgment as to Mr. Thurston's IIED claim. Mr. Thurston has not shown that Defendants engaged in "extreme and outrageous" conduct. As the

25

Court has discussed at length, Lt. Buchanan does not appear to have had probable cause to seek the arrest which caused Mr. Thurston emotional harm; however, Mr. Thurston has not pled specific facts that show that the lack of probable cause rises to the level of outrageous conduct. In other words, Mr. Thurston has not shown that Lt. Buchanan or Sheriff Frye acted in such a way that their behavior would be wholly intolerable in a civilized society. Therefore, Mr. Thurston's IIED claim fails as a matter of law.

### 4. Plaintiff's Negligent Infliction of Emotional Distress Claim

Plaintiff's claim for negligent infliction of emotional distress ("NIED") likewise fails. To establish a claim for NIED, a plaintiff must allege and prove that: (1) the defendant negligently engaged in conduct; (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress or mental anguish; and (3) the conduct did in fact cause the plaintiff severe emotional distress. Johnson v. Ruark Obstetrics, 327 N.C. at 304. A public officer performing discretionary acts, however, is absolutely immune from mere negligence claims. Shaw v. Stroud, 13 F.3d 791, 803 (4th Cir. 1994) (citing Hare v. Butler, 99 N.C. App. 693, disc. rev. denied, 327 N.C. 634 (1990)). A negligent infliction of emotional distress claim, by its very definition, necessarily alleges only negligence. Therefore, Sheriff Frye and Lt. Buchanan are absolutely immune from any negligent infliction of emotional distress claim under North Carolina law.

### 5. Plaintiff's Battery and Assault Claims

North Carolina follows common law principles governing assault and battery. Dickens v. Puryear, 302 N.C. 437, 444–45 (1981). An assault is an offer to show violence to another without striking him, and a battery is the carrying of the threat into effect by the infliction of a blow. Dickens, 302 N.C. at 444–45 (citing Hayes v. Lancaster, 200 N.C. 293 (1931); Ormond v.

Crampton, 16 N.C. App. 88, cert. denied, 282 N.C. 304 (1972)). The interest protected by the action for battery is freedom from intentional and unpermitted contact with one's person; the interest protected by the action for assault is freedom from apprehension of a harmful or offensive contact with one's person. Dickens, 302 N.C. at 444–45 (citing McCracken v. Sloan, 40 N.C. App. 214 (1979)).

Here, neither Sheriff Frye nor Lt. Buchanan arrested or had any physical contact with Mr. Thurston. Furthermore, neither Sheriff Frye nor Lt. Buchanan ever threatened Mr. Thurston with imminent physical violence. Therefore, Mr. Thurston's claims for assault and battery fail as a matter of law.

### C.        North Carolina Constitutional Claim

A plaintiff may pursue a direct action under the North Carolina Constitution only where the plaintiff lacks a remedy under state law adequate to redress the alleged violation. Craig ex rel. Craig v. New Hanover Cty. Bd. of Educ., 363 N.C. 334, 338 (2009); Corum v. Univ. of N.C., 330 N.C. 761, 782 (1992). "[T]o be considered adequate in redressing a constitutional wrong, a plaintiff must have at least the opportunity to enter the courthouse doors and present his claim." Copper ex rel. Copper v. Denlinger, 363 N.C. 784, 789 (2010).

Defendants are entitled to summary judgment as to Mr. Thurston's state constitutional claim. Mr. Thurston has available and adequate remedies in the form of individual capacity claims such that his state constitutional claim is barred. This would be so even if these individual capacity claims were barred by an immunity doctrine. DeBaun v. Kuszaj, 228 N.C. App. 567 (2013); Rousselo v. Starling, 128 N.C. App. 439, 448-49 (1998).

Finally, as Defendants note in their Reply, Mr. Thurston's fleeting reference to the North Carolina Constitution in one sentence of one paragraph of the Amended Complaint does not

27

constitute a claim of relief. One line in a conclusory paragraph does not constitute a claim under Federal Rule of Civil Procedure 8(a)(2) which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."

## IV. CONCLUSION

In sum, for the reasons stated herein, Defendants' Motion for Summary Judgment (Doc. No. 13) is granted in part and denied in part.

**IT IS, THEREFORE, ORDERED** as follows:

1. Defendants' Motion for Summary Judgment regarding Plaintiff's Section 1983 false arrest/unlawful seizure claim is **DENIED**.

2. Defendants' Motion for Summary Judgment regarding the Official Capacity claims against Sheriff Frye and Lt. Buchanan is **GRANTED**.

3. Defendants' Motion for Summary Judgment regarding the Individual Capacity claims against Sheriff Frye and Lt. Buchanan is **DENIED**.

4. Defendants' Motion for Summary Judgment regarding any claims brought against the Avery County Sheriff's Office is **GRANTED**.

5. Defendants' Motion for Summary Judgment regarding municipal liability is **GRANTED**.

6. Defendants' Motion for Summary Judgment regarding Plaintiff's malicious prosecution and false arrest/false imprisonment state law claims is **DENIED**.

7. Defendants' Motion for Summary Judgment regarding Plaintiff's IIED, NEID, Assault, and Battery state law claims is **GRANTED**.

8. Defendants' Motion for Summary Judgment regarding Plaintiff's claims under the North Carolina Constitution is **GRANTED**.

Signed: March 22, 2021

Max O. Cogburn Jr.
United States District Judge

29